*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 10-CV-1425

SHERRY ALLEN AND WAYNE ALLEN, APPELLANTS,

v.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CAM-7229-08)

(Hon. Robert I. Richter, Trial Judge)

(Argued May 23, 2012                    Decided September 25, 2014)

*Stephen D. Annand*, with whom *David E. Haynes* was on the brief, for appellant.

*Carl J. Schifferle*, Assistant Attorney General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General, were on the brief, for appellee.

Before THOMPSON and EASTERLY, *Associate Judges*, and NEBEKER, *Senior Judge*.

Opinion for the court by *Senior Judge* NEBEKER.

Dissenting opinion by *Associate Judge* EASTERLY at page 27.

NEBEKER, *Senior Judge*: In this matter, appellants, Sherry Allen and Wayne Allen, filed a wrongful death and survival action against the District of Columbia, after their son Eric Allen ("Allen," aka Eric Roberson, a prospective firefighter, participated in a required Physical Ability Test ("PAT"), became ill, and died. Appellants allege "gross negligence of the EMT [emergency medical technician] in charge of evaluating the firefighter candidates at the PAT." The issues we address on appeal are (1) whether the public duty doctrine applies and bars the action or, instead, (2) whether the action may proceed, either because the doctrine is not implicated on the facts of this case, or because an exception to the doctrine applies, on the ground that the District owed a special duty to Allen. The trial court granted summary judgment in favor of the District, applying the public duty doctrine and holding that the District owed no special duty to Allen. We affirm.[1]

---

[1] This appeal was stayed on September 12, 2013, to await action on an en banc petition in *Woods v. District of Columbia*, 63 A.3d 551 (D.C.), *reh'g denied en banc*, No. 11-CV-1011 (Dec. 17, 2013), which presented, at invitation from within the court, whether the public duty doctrine should be abrogated. Interestingly, after the en banc petition was filed, the District of Columbia Council – independently of the District's Attorney General – filed an amicus response opposing en banc action to overturn that long standing doctrine. The thrust of that response by the legislative branch was budgetary instability combined with the public policy nature of the issue arguing for legislative – not judicial – judgment. One might expect that if the wish of our dissenting colleague were to materialize the two other branches would legislatively nullify our abrogation of that judge-made doctrine as the amicus response suggested.

**I.**

The record reveals that in March of 2006, Eric Allen began the lengthy process of qualifying to be a firefighter with the District of Columbia Fire and Emergency Medical Services Department (FEMS).[2]  On October 14, 2007, the District invited Allen and approximately two dozen others to participate in its Physical Ability Test (PAT) in order to determine if he was physically qualified to be a firefighter.[3]  Prior to beginning the test, FEMS Captain Sylvester Robinson directed the candidates to have their vital signs (blood pressure, pulse rate, and oxygen saturation) taken by the on-scene paramedic, and all were permitted to participate in the PAT thereafter. Paramedic EMT Lee Mason and EMT Veronica Johnson (aka Veronica Baskerville), who were staffing a unit known as "Medic 33" and who had been "assigned to the [DC Fire/EMS] training academy" as the

---

[2]  Less than two weeks after submitting his application, Allen also submitted a "Letter of Intent" in order to take the Paramedic/Firefighter Entry-Level examination.  In May of 2006, he successfully completed the exam.

[3]  The PAT test contains nine separate components, which an applicant is required to complete. These components include:  (1) aerial ladder climb; (2) hydrant opening; (3) ladder carry; (4) ladder extension; (5) charged line advance; (6) stair climb with equipment; (7) ceiling pole; (8) victim rescue in a confined space; and (9) victim rescue dummy drag. As many as two dozen prospective firefighters may have participated in the PAT that day.  Approximately 120 persons participate in the PATs on an annual basis.

"stand-by unit" "for the purpose of the test[,]" had set up a station for vital-sign screening (Robinson referred to it as a "first aid station") in Room 2 at the test site. After the candidates' vital signs had been taken, several FEMS monitors escorted the prospective firefighters through each of the components of the PAT. The candidates, monitors, and escorts were told that if they experienced any problems on the course at any point, they should ask for Captain Robinson, who was the classroom facilitator for the PAT, or for Battalion Fire Chief Milton Douglas, who would "respond to their location." The FEMS Physical Ability Test Administration Guide instructed monitors that they must "watch candidates for signs that they are in physical distress" and that "[i]f these signs are seen, it is important that the candidate be stopped and monitored by the on-scene paramedic."

Upon completion of the PAT, Allen became ill and complained of "pain in his entire body." Allen informed Battalion Fire Chief Douglas that he did not have any long-term medical problems. Douglas notified Captain Robinson, to "have the Medic Unit that was assigned to the training academy for the purpose of the test to report to the [PAT] apparatus floor to evaluate [Allen]." Robinson, who was at the finish line when Allen completed the course to escort him back to Room 2 to have his vital signs taken, observed that Allen "showed signs of rapid breathing that was

not normal[.]" Robinson "ran" to the room where paramedic Mason and EMT Johnson were stationed and told them that a candidate was having trouble breathing and that their assistance was needed.[4] Robinson told them that "they were going to need their oxygen," "[a]t which time they informed [him that] they had to go to [their ambulance, which was parked beside the test-site building] unit to get it."[5] Mason and Johnson evaluated Allen, took his vital signs and performed an EKG.[6] They placed Allen on oxygen, but did not administer IV fluids. Mason told Douglas that Allen required transport to a hospital. Douglas notified Robinson to dispatch an ALS Medic Unit for patient transport. When Robinson asked Mason and Johnson "if they were going to transport[,]" Mason informed Douglas and Robinson that Allen's "vital signs were normal and that a basic unit was all that was required." Robinson therefore called for a basic life support unit, and one was dispatched, arriving in about six to ten minutes. EMT Thomas Williams, a

---

[4] Robinson also summoned PAT candidate Justin Free, who was a "paramedic crossover," telling him that (in the absence of Mason and Johnson) his assistance was needed in checking the vital signs of the other candidates, so that those candidates could be released. Free and Robinson "then went to Engine 3, which is a paramedic company, and got the equipment necessary to perform the post vital exam" on the other candidates.

[5] Mason had not brought into the test site her "ALS [Advanced Life Support] Jump Bag."

[6] The Complaint alleges that Allen had an "extremely elevated heart rate of 142 beats per minute, as well as rapid respirations, a low diastolic blood pressure, and other indications of severe illness."

member of the responding basic life support unit, recalled that "no engine company (first responder) was being dispatched because a paramedic [presumably, Mason] was already on the scene." Williams asked Mason what code Allen should be, and Mason classified Allen as a "Priority 3 (stable, nonemergency)," the lowest emergency priority. EMT Williams and EMT John T. Davis, transported Allen to the Greater Southeast Community Hospital where he was immediately placed in the waiting room because, at least in part, Greater Southeast Community Hospital saw no reason to change his classification to a higher priority. Allen waited approximately one hour, his condition worsened, and he was eventually flown by helicopter to Washington Hospital Center, where he died of "acute exertional rhabdomyolysis" (Rhabdo) the morning of October 15th.

Appellants brought survival and wrongful death actions sounding in negligence against the District, Greater Southeast Community Hospital, and the doctors who attended Allen at the hospital for an alleged failure to exercise reasonable care in attending to Allen. The District moved to dismiss the action. Because both parties had submitted a variety of depositions and exhibits and stated to the court that "the record [was] now complete," the trial court, without objection, treated the motion as one for summary judgment, and found for the District by concluding there was no "special relationship" that excepted this case

from the public duty doctrine and that the doctrine applied to bar the action.  The other parties settled with appellants, and this appeal followed.[7]  After oral argument, we stayed the appeal pending a determination as to whether this court would sit en banc to review the application of the public duty doctrine in another case.  The petition for rehearing en banc in that case was denied on February 7, 2014, and we now proceed to resolve this appeal.

---

[7]  After the trial court granted summary judgment for the District, appellants moved the court to reconsider its decision, or, in the alternative, to certify an interlocutory appeal to this court since the hospital defendants remained involved in the lawsuit. The trial court declined to reconsider its decision but agreed to certify to this court, pursuant to D.C. Code § 11-721 (d) (2001), whether or not the plaintiffs' claims against the District could be dismissed under the public duty doctrine.  Only a short time later, appellants and the other defendants settled their claims.  Thereafter, appellants noted an appeal of the trial court's order with respect to summary judgment.  The District moved to dismiss the appeal on account of the fact that it still had a cross-claim against the hospital defendants, and the Allens opposed the motion because no other parties remained in the action. On June 20, 2011, this court, agreeing with the Allens, concluded that the trial court's summary judgment order was now a final and appealable order, and the interlocutory appeal was moot.

## II.

### A.    Standard of Review

"Summary judgment is properly granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Turner v. District of Columbia*, 532 A.2d 662, 666 (D.C. 1987) (quoting Super. Ct. Civ. R. 56 (c)). "On appeal this court must view the record in the light most favorable to the party opposing the motion, and must resolve any doubt as to the existence of a factual dispute against the moving party." *Taylor v. District of Columbia*, 776 A.2d 1208, 1213-14 (D.C. 2001). "In short, what we seek is evidence from which, were it accepted as true, a trier of fact might find for the appellant." *Truitt v. Miller*, 407 A.2d 1073, 1077 (D.C. 1979).

### B.    Public Duty Doctrine

The public duty doctrine "operates to shield the District and its employees from liability arising out of their actions in the course of providing public

services." *Hines v. District of Columbia*, 580 A.2d 133, 136 (D.C. 1990). In essence, appellants claim that Allen's circumstances made him excepted from the public duty doctrine through his establishment of a special relationship (or "special duty") with the District because, at least in part, Allen's emergency was not a typical "911 emergency." As such, appellants acknowledge that this court has applied the public duty doctrine in cases involving the provision of emergency services.

## 1. Whether the Public Duty Doctrine Applies

At the commencement of this action, the public duty doctrine was assumed to apply; thus, what was litigated in the trial court, and originally briefed here, was that the doctrine applied save for the exception.[8] On appeal, it was not until appellants' Reply Brief that they argued that the "public duty doctrine does not apply to the situation presented here." "Normally, we do not consider arguments

---

[8] Appellants did assert in their sur-reply in opposition to the District's dispositive motion that "the public duty doctrine is entirely inapplicable to the case at bar." They made the same argument in their Motion for Reconsideration of the trial court's ruling, saying that "the Public Duty Doctrine should not have been applied in this case at all." In its order denying the Motion for Reconsideration, the trial court referred to the Allens' "arguments concerning the application of the public duty doctrine generally" and said that "these arguments have been rejected."

raised for the first time in a reply brief." *Williams v. United States*, 52 A.3d 25, 50 n.104 (D.C. 2012). However, we will make an exception when failing to do so "would permit a clear miscarriage of justice to occur." *Cannon v. District of Columbia*, 569 A.2d 595, 596 (D.C. 1990). For that reason, and because this court has never addressed whether the public duty doctrine is applicable with respect to conduct by EMS personnel who are assigned to provide on-site vital-signs monitoring of firefighter candidates during administration of a PAT, we requested additional briefing after oral argument on the issue of whether the public duty doctrine is implicated in the first place. Now that both parties have briefed the issue, we believe that it is appropriate for us to decide the issue.[9] After reviewing the supplemental briefs, we find that the public duty doctrine is applicable.

"Under the public duty doctrine, the District has no duty to provide public services to any particular citizen unless there is a 'special relationship' between the emergency personnel — police officers, firefighters, and EMTs — and an

---

[9] *See, e.g., Chesapeake & Potomac Tel. Co. v. Public Serv. Comm'n*, 339 A.2d 710, 712 n.6 (D.C. 1975) ("Although neither the Commission nor the Telephone Company presented this issue on appeal, this court sua sponte requested supplemental briefs concerning the applicability of the APA to proceedings before the Commission."); *Outlaw v. United States*, 632 A.2d 408, 411 n.7 (D.C. 1993) ("A court may consider an issue antecedent to . . . and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief." (quoting *United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am.*, 508 U.S. 439, 447 (1993) (internal quotation marks omitted))).

individual." *Woods v. District of Columbia*, 63 A.3d 551, 559 (D.C. 2013) (Oberly, J., concurring in the judgment) (quoting *Allison Gas Turbine Div. of Gen Motors Corp. v. District of Columbia*, 642 A.2d 841, 843 (D.C. 1994)); *Hines*, *supra*, 580 A.2d at 136 ("[A]bsent some 'special relationship' between the government and the individual, the District's duty is to provide public services to the public at large[,]" not to any individual who emerges to seek services); *id.* at 139-40 (agreeing that "responses to calls for emergency assistance are simply not actionable under the public duty doctrine"); *Wanzer v. District of Columbia*, 580 A.2d 127, 129 & 132 (D.C. 1990) (holding, in case where claim was that the decedent "would have survived his stroke if an ambulance had been sent when first summoned," that the public duty doctrine barred a suit alleging negligent and inept failure to dispatch an ambulance); *Johnson v. District of Columbia*, 580 A.2d 140, 143 (D.C. 1990) (reasoning that the facts pled "could not sustain liability insofar as they merely represent the failure of the firefighters to perform any particular step that might have alleviated [the decedent's] condition"). We are satisfied that the public duty doctrine applies here because of the evolving role of the EMTs Mason and Johnson.

The record shows that, as monitors for the PAT, Mason and Johnson set up their station in a classroom some distance from the PAT apparatus floor (Robinson

had to "run" there after seeing Allen in distress) for taking pre- and post-test vital signs of PAT participants. Their role was to ensure that all the candidates were physically qualified to begin the test and to take their vital signs at the end (presumably to determine whether they were in a physical condition as to have "passed" the test) and to "monitor" any candidate observed to be in distress. They brought into the classroom a "Lifepak monitor and a BP cuff and stethoscope," the equipment needed to take vital signs. PAT monitors were instructed that if they saw signs of distress, they were to have the candidate "monitored by the on-scene paramedic."[10]

When Captain Robinson ran to get Mason and Johnson after Allen had finished the course and had trouble breathing, he was not seeking monitoring but emergency assistance, telling the EMTs that they would need their oxygen. They had not brought into the PAT site the equipment – for example, oxygen and an ALS jump bag – they needed to act as emergency responders, but went to retrieve them from their ambulance and stepped into the role of emergency first-

---

[10] Appellants make no claim that Mason and Johnson, or any other FEMS personnel at the PAT site, failed to observe the candidates for safety, to monitor whether they were in distress, or to summon help.

responders.[11]  For that reason, no engine-company first responder was dispatched to the PAT site.  In thereafter advising that Allen needed to be transported to the hospital but required only a basic life support unit, Mason and Johnson functioned in a manner similar to a 911 dispatcher, who must make a call as to whether an ambulance is needed, and which type is required (basic or advanced life support). *Cf. Wanzer*, *supra*, 580 A.2d at 127 (affirming dismissal of suit on basis of the public duty doctrine, where facts were that the 911 caller complained of a headache and asked for ambulance to be sent, the 911 dispatcher declined to send an ambulance and advised the caller to "take an aspirin," and the caller subsequently died of a stroke).  Reviewing paramedic Mason's performance after the fact, her superiors concluded that she failed in several ways to respond appropriately to Allen's condition.[12]  Notably, however, they did not find that

---

[11]  This was not their usual PAT role:  When Mason determined that Allen required hospital transport, Captain Robinson *asked* whether Mason and Johnson would transport Allen, rather than assuming that they would do so in their ambulance that was parked nearby.  Mason "had worked as a paramedic at many previous PAT's" and had never had to transport anyone.  For its part, see note 3 *supra*, FEMS had no arrangement in place for replacement EMTs to take the candidates' post-test vital signs if (as happened here) those assigned to the task were called away to act as emergency responders.

[12]  They found, *inter alia*, that Mason

> failed to recognize the severity of the patient's condition; failed to perform a complete patient assessment; ignored or failed to recognize an abnormal EKG; ignored her

(continued…)

Mason failed to bring oxygen and advanced life support equipment into the test site when setting up for the PAT.

The foregoing facts are described in the documentary evidence and appear to be undisputed. When we consider them in the light most favorable to appellants, as we must, we see no basis for concluding that that any acts or omissions by Mason in responding to Allen's health crisis were part of the PAT program rather than a part of the District's provision of emergency services. Any negligence of Mason (and Johnson) in treating Allen occurred once their role evolved from basic monitors to emergency responders. And, "[b]oiled down to their essen[c]e," appellants' claims about Mason's and Johnson's negligent failure to properly evaluate Allen's condition "amount[] to the same basic allegation" that we held in

_____

(…continued)

> duty to the patient by requesting a basic life support . . . unit . . . to transport the patient; failed to perform standard ALS [advanced life support] assessment procedures and interventions, such as 12-lead EKG and IV fluid administration, that were clearly indicated; failed to provide a proper report to the transporting unit; [and] ordered the transporting . . . unit to categorize the patient as a stable, non-emergency Priority 3 transport[.]

As a result, Mason was removed from "patient contact status", and "appropriate disciplinary action[,]" including the possibility of termination, was recommended. *Cf. Morgan*, *supra*, 468 A.2d at 1312 (although public duty doctrine barred suit, "other effective mechanisms exist to control the behavior of errant . . . officials.").

*Hines* is barred by the public duty doctrine: allegations that "the wrong unit was dispatched"; "the call for the correct unit (advanced life support)" was not made; and the equipment dispatched was not adequate. 580 A.2d at 139. For these reasons, we conclude that the public duty doctrine is applicable. To hold otherwise would create a perverse incentive for the District to require its EMTs who are assigned to the PAT and thus are nearby to refrain from rendering emergency assistance to candidates lest the District forfeit, as to any deficiencies in their emergency responses, the shield from liability it would enjoy if it waited for emergency response units to be dispatched from elsewhere (just as when a call is made to 911 for emergency assistance).

As we have previously recognized,"[t]he District of Columbia should be free to exercise its police power for the benefit of the general public without the fear that by making contact with citizens in the course of carrying out its responsibilities, the District may forfeit its immunity under the public duty doctrine[.]" *District of Columbia v. Forsman*, 580 A.2d 1314, 1319 (D.C. 1990).[13] In this case, unless an exception to the public duty doctrine applies, the District was free to use FEMS paramedics who were on duty at the PAT test to respond to

---

[13] "[O]peration of the EMS is an exercise of the District's police power to further the general health and welfare[.]" *Wanzer*, *supra*, 580 A.2d at 131.

the health emergency that arose, without the risk that by doing so it would expose itself to liability.

## 2.    Application of the Public Duty Doctrine

In order to establish a special relationship, or "special duty," that falls under an exception to the public duty doctrine, "a plaintiff must allege and prove two things:   (1) a direct or continuing contact between the injured party and a governmental agency or official, and (2) a justifiable reliance on the part of the injured party." *Klahr v. District of Columbia*, 576 A.2d 718, 720 (D.C. 1990) (citing *Turner*, *supra*, 532 A.2d at 667).

The Superior Court observed that the main dispute between the parties was whether Allen had a special relationship with the District.   The court acknowledged some direct contacts in that Allen had communicated with FEMS throughout the application process, and some reliance on FEMS's representations about the PAT, but nevertheless held that appellants had not established more than a duty of the FEMS to assist the general public, which was insufficient to show that the District created a special relationship with Allen.   For the court, it was important that appellants had not claimed that the District specifically recruited

Allen or any candidate and that any individual could apply to be a firefighter and the District would have corresponded with them to the same extent. Thus, simply "because a person 'emerges' from the general public to the attention of the government does not establish a special relationship." The presence of EMS at the PAT was "no different than a city stationing an ambulance at a high school football game to assist the players if they become injured." It was simply a gratuitous promise like the one in *Morgan v. District of Columbia*, 468 A.2d 1306 (D.C. 1983) (en banc).

### a. Direct and Continuous Contact

Here, appellants contend that the District established direct and continuous contact with appellants sufficient to establish a special relationship because it recruited and evaluated prospective firefighters. Specifically, appellants urge, much as they did in the Superior Court, that Allen (1) had direct and continuing contacts with the District because he applied to FEMS in March of 2006, approximately eighteen months before the PAT test, (2) signed a "Letter of Intent" in April of 2006 to participate in the entry-level Firefighter Written Examination, (3) completed and passed the examination the following month, (4) was provided

an "Initial Notice" by the District in September of 2007, and (5) was invited to participate in the PAT test on October 14, 2007.

As noted above, as many as two dozen applicants were assembled for physical screening. All were subjected to the same scrutiny before the PAT began, and then Allen suffered pain and difficulty breathing. Medical aid was summoned, just as if he had been overcome with pain on a nearby street. It is from this that we are asked to declare an exception to the public duty doctrine by virtue of a special relationship between Allen, his nearly two dozen peers, the more than 100 prospective firefighters that participate in the PAT every year, and the medics on-scene performing the screening.

In order to establish a special relationship, appellants have the burden to show direct or continuing contact between Allen and FEMS. *Klahr*, *supra*, 576 A.2d at 720. Appellants attempt to show that Allen established a special relationship for his emergency situation by his repeated contacts with the District more than a year (and up to a year-and-a-half) earlier. As the trial court here observed, "any individual could have applied to be a firefighter and the District would have corresponded with that person to the same extent that it corresponded with Eric Allen." *See Nealon v. District of Columbia*, 669 A.2d 685, 693 (D.C.

1995) ("A party must show that such contact was different from the type of contact that the District has with the general public" (citing *Powell v. District of Columbia*, 602 A.2d 1123, 1130 (D.C. 1992)). If the District had effectively made a promise to protect Allen, that promise would have applied equally to the more than one hundred other contenders who participate in the PAT every year, and the two dozen PAT participants that day. This would require either having over two dozen special relationships that day and more than one hundred over the course of the year, as to each applicant being screened (which is not practical or possible), or holding that the response to the sudden disability by the ones initially called upon created that relationship. By definition of a special relationship, that is not practicable or legally possible. *Hines*, *supra*, 580 A.2d at 136 ("Our case law makes it clear that the mere fact that an individual has emerged from the general public and become an object of the special attention of public employees does not create a relationship which imposes a special legal duty."); *cf. Varner*, *supra*, 891 A.2d 260, 276 (D.C. 2006) (police presence on campus of Gallaudet University, and promise to protect some 2,000 students could not create 2,000 special relationships without "nullify[ing] the [public duty] doctrine itself").

A government functions through people, usually its citizens. Thus, the primary task for its leaders (after they are chosen) is to recruit and evaluate those

potentially available to facilitate the governmental role of providing public services. An emergency resulting thereafter from the provision of emergency services is insufficient to engender a special relationship.

More specifically, appellants' claim that Allen established direct or continuing contact with the District through his actions as a prospective employee must also fail. *See Flemmings v. District of Columbia*, 719 A.2d 963, 964 (D.C. 1998) (rejecting, in a case involving a police officer who was shot by his girlfriend, who was also a police officer, the argument that employment by the District created a special relationship with the District). Appellants cannot, without more, show direct or continuous contact by relying on what Allen did several months, or more than a year earlier, to show that there was a special relationship. As we stated in *Wanzer*, *supra*:

> Even a series of contacts over a period of time between a public agency and an injured or endangered person is not enough to establish a special relationship, absent some showing that the agency assumed a greater duty to that person than the duty owed to the public at large. If it were otherwise, then the city would be potentially liable for 'every oversight, omission, or blunder' of its officials — a liability which potentially could so deplete the resources necessary to provide police protection, fire protection, and ambulance service as to result in the elimination of those services altogether.

580 A.2d at 132 (citation omitted); *accord Powell*, *supra*, 602 A.2d at 1130-31 ("[M]ere contacts are insufficient in the absence of evidence of a special duty . . . [We] require[] . . . proof of a type of contact different from that of the District with the general public, . . . [and] proof of justifiable reliance."). Thus, appellants' proffer of such remote contacts fails to show how EMTs responding to Allen's emergency had somehow established a special relationship with him.

Even assuming *arguendo* that appellants could claim that a special relationship was established between himself and the District (specifically, FEMS recruitment personnel) while he was acting as a prospective FEMS employee, that special relationship would not also encompass the alleged EMT errors during Allen's medical emergency. *Cf. Stoddard v. District of Columbia*, 623 A.2d 1152, 1153-54 (D.C. 1993) (concluding that even though some parents could prove that they justifiably relied on presence of school crossing-guards, child without parent who crossed street some two football fields from crosswalk could not claim special relationship); *Forsman*, *supra*, 580 A.2d at 1318 (concluding that even if government agent's assistance in one matter was sufficient to create special relationship in that matter, it was not sufficient to create special relationship in entirely different matter). Nor do appellants claim in their brief that the EMTs

responsible for transporting Allen in the basic life-support unit were the source of a special relationship between Allen and the District.

Finally, appellants argue forcefully that Allen's emergency was not a "911 emergency call case." As appellants state in their brief, and as the record reflects, despite any on-scene assessment of Allen by EMTs, FEMS personnel had to radio for a basic-life support unit to transport Allen to a hospital, which did not arrive until several minutes later, much like a regular emergency situation. Despite the presence of EMTs Mason and Johnson on scene at the PAT, we are not prepared to distinguish this case from "emergency services cases" strictly because FEMS personnel radioed for a basic life support unit rather than dialing 911 for emergency services like a regular citizen. *See Hines*, *supra*, 580 A.2d at 136 (concluding "actions that are a necessary part of the on-scene responsibility of government agents subject to the public duty doctrine add[] nothing to the general duty owed the public and fail[] to create a relationship which imposes a special legal duty.") (alterations in original) (internal quotation marks omitted); *accord Wanzer*, *supra,* 580 A.2d at 132 ("A one-time call to 911 for help does not establish a special relationship."). In an emergency context, we explicitly deny the jury the opportunity to judge the actions of EMTs in hindsight in the absence of affirmative negligence (i.e., affirmative action that worsens the condition of the

individual receiving emergency services).  *See Johnson*, *supra*, 580 A.2d at 142, 143.

### b.  Justifiable Reliance

Even assuming *arguendo* that appellants did establish direct or continuing contacts (and they have not done so here), appellants fail to demonstrate justifiable reliance.  *See Snowder v. District of Columbia*, 949 A.2d 590, 604 n.12 (D.C. 2008).  On this point, the trial court concluded that appellants had not shown that Allen acted or refrained from acting in reliance on the EMTs.  The court reasoned that appellants essentially claimed that the EMTs were inadequate and untimely in their response to Allen's emergency, and this court rejected such a claim in *Johnson*, *supra*, 580 A.2d 140.

Appellants contend that the District's requirement that firefighters pass the PAT significantly raised the "quotient of risk" above that assumed by the general public.  Additionally, Allen justifiably relied on the District, appellants argue, because FEMS provided monitors for each candidate participating in the PAT, and told them to speak with FEMS personnel in charge of the PAT if they experienced problems while completing the components.  From the combination of those facts,

appellants contend, "it can be reasonably inferred" that Allen justifiably relied on [FEMS] and the PAT safety precautions.

To show justifiable reliance, a "plaintiff [or person allegedly in privity with the District] must specifically act, or refrain from acting, in such a way as to exhibit particular reliance upon the actions of the [EMTs] . . . . Liability is established, therefore, if the [EMTs] [have] specifically undertaken [action on behalf of] a particular individual and the individual has specifically relied upon the undertaking." *Morgan*, *supra*, 468 A.2d at 1315 (citations omitted); *see Taylor*, *supra*, 776 A.2d at 1218 (citing *Morgan*, *supra*). As we have stated, despite what a jury could "reasonably infer" with respect to justifiable reliance, such an argument "cannot substitute for *evidence* of 'justifiable reliance.'" *Taylor*, *supra*, 776 A.2d at 1220 (emphasis added).

Here, appellants have not shown justifiable reliance in order to establish a special relationship. Despite their conclusory allegations to the contrary, appellants have failed to show that Allen acted or failed to act in any way, because of the presence of EMTs, PAT monitors, or any other safety personnel at the test. Indeed, a conclusion that there was a special relationship between Allen and the District, relying overwhelmingly on the fact that EMTs were present at the PAT,

would be the impetus toward perverse incentives such as the avoidance of safety precautions. *Cf. Varner*, *supra*, 891 A.2d at 272 (holding that operational manuals do not establish standard of care because, to hold otherwise, "would create the perverse incentive . . . to write [manuals] in such a manner as to impose minimal duties . . . in order to limit civil liability." (internal quotation marks omitted)). Additionally, Allen's decision to sign the liability waiver that FEMS required him to sign before he could participate in the PAT, regardless of its legal value otherwise, is indicative of Allen's assent to the District's claim that it could not be held liable for any injuries or death as a result of the PAT and undermines any claim that the District was on notice that Allen would rely FEMS to ensure that no harm befell him.[14] Even assuming appellants could claim justifiable reliance based on the deposition testimony (e.g., BFC Douglas's testimony that FEMS "assume[d] the obligation to be responsible for [firefighter candidates] when they're in the [PAT]"), without direct or continuous contact (which does not exist here), appellants' claim of a special relationship fails, and the public duty doctrine applies. *See Snowder*, *supra*, 949 A.2d at 604 n.12.[15]

---

[14]  As the waiver explicitly states, Allen agreed to "assume any and all risk and liability for . . . death which [he] might suffer or sustain while [o]n any . . . property or premises owned or operated by [FEMS] or the [District]."

[15]  Appellants also claim that the District was affirmatively negligent in providing emergency services care for Allen and that the District did not

(continued…)

Finally, appellants' focus on Mason's classification of Allen as a "priority 3," requiring Mason to "br[ing] in" a basic life support unit during the emergency rather than a better equipped vehicle, is unpersuasive. The claim, in essence, is one attacking the adequacy and timeliness of emergency services, which this court foreclosed more than two decades ago. *See Hines*, *supra*, 580 A.2d at 136, 139-40 ("[C]hallenges to the adequacy and timeliness of the dispatch of emergency equipment . . . are simply not actionable under the public duty doctrine."); *see also Allison Gas Turbine*, *supra*, 642 A.2d at 843-44 (citing, *inter alia*, *Hines*, *supra*, for the same proposition).

---

(…continued)

adequately screen candidates for (and exclude those with) "Sickle Cell Trait." As the trial court observed, appellants argued in its response to the District's motion to dismiss that it did not need to prove affirmative negligence, made no effort to prove it, and changed course in a last minute supplemental brief on appellants' motion for reconsideration (of the Court's summary judgment for the District), more than a month after its initial brief in its motion for reconsideration. We decline to consider appellants' argument of affirmative negligence on appeal because it is contrary to the position appellants took prior to summary judgment. *See, e.g.*, *Duk Hea Oh v. National Capital Revitalization Corp.*, 7 A.3d 997, 1010 (D.C. 2010) ("[A] defendant may not take one position at trial and a contradictory position on appeal.") (quoting *Brown v. United States*, 627 A.2d 499, 508 (D.C. 1993)). We also decline to consider appellants' "Sickle Cell trait" argument because it was not adequately raised below. *See In re D.A.J.*, 694 A.2d 860, 864 (D.C. 1997) ("Questions not properly raised and preserved during the proceedings under examination, and points not asserted with *sufficient precision to indicate distinctly the party's thesis*, will normally be spurned on appeal." (emphasis added) (internal quotation marks omitted)).

Appellants would have this court look to possible negligence in the sequence of events before Allen's death and his reliance on government actors. We cannot do so because such factors are relevant only if potential liability is, by the special relationship exception to governmental immunity, established in the instance. In light of the foregoing considerations, we conclude that the public duty doctrine protects the actions of the District and its employees in connection with the provision of emergency services here.

The grant of summary judgment in favor of the District is

*Affirmed*.

EASTERLY, *Associate Judge*, dissenting: This is not a public duty doctrine case—at least not as the public duty doctrine has ever been conceived by this court. As its name suggests, the ostensible goal in applying this doctrine, at least at first, was to discern whether the District had an actionable duty of care when its agents were alleged to have acted negligently. But there should be no question that the District owed a duty of care to Eric Allen. The District, through its FEMS agents, screened Mr. Allen and invited him to the District of Columbia Fire and Emergency Medical Services (FEMS) Training Academy to take FEMS's Physical

Ability Test (PAT). FEMS agents knew the PAT created the risk of injury and illness, and for that reason among others had medical staff on hand during the test. And if that were not enough, the FEMS medical staff at the PAT actually undertook care of Mr. Allen when he fell ill, just as they were supposed to (although presumably they were supposed to provide competent care).

The application of the public duty doctrine to these facts—to uphold a grant of summary judgment no less—demonstrates that this doctrine is analytically bankrupt. It applies whenever this court says it does, and we seem to be willing to apply it to an ever-expanding set of circumstances, including cases where, as here, District employees help specific individuals and then perform negligently. We have now completely departed from the traditional common law of negligence from which our public duty doctrine was purportedly derived.

In light of this, I do not know what logic, if any, drives or contains our public duty doctrine. From the majority opinion's focus on the identity and function of the FEMS staff who provided Mr. Allen medical care, it appears to have morphed into a form of immunity, at least for certain categories of District employees. Indeed, in its final paragraph, the majority opinion uses the words "governmental immunity" to refer to the public duty doctrine. But if this is how

the court is now employing our public duty doctrine, we have a problem: This public duty doctrine "immunity" conflicts with our sovereign immunity jurisprudence that currently defines when the District government may be sued for the harm done by its agents.

It is time for this court to explain what we are doing and why. Of the states that still have some iteration of this doctrine (many have rejected it), the District stands alone in interpreting it the way that we do. We should take note of our outlier status. We should acknowledge both that there are other more coherent mechanisms for protecting the District from suit where holding the government liable may be truly counterproductive, and that, in some cases, we will actually better promote public safety and responsible government by holding the District accountable for the negligent actions of its employees in an open court of law. FEMS, for example, has now enjoyed the protection of the public duty doctrine for decades. But news reports of FEMS' multiple failures to provide competent emergency services to individuals in the District (detailed below) indicate that, by shielding FEMS from the scrutiny of being sued, we have allowed dysfunction to fester.

As illustrated by this case, this court's public duty doctrine has lost any coherence, logic, or sense of rightness that it ever may have had.  I dissent from the majority opinion's extension of the public duty doctrine to the facts presented, and I renew the call to this court to reconsider the doctrine it created and has allowed to run amok.

## I.  Facts

This case was resolved by an order granting the District summary judgment.  In this context, this court is required to "independently analyze the record in the light most favorable to [the Allens], drawing all reasonable inferences from the evidence in [their] favor."  *Medhin v. Hailu*, 26 A.3d 307, 310 (D.C. 2011).  The record facts are these:

Eric Allen, a 23-year-old high school graduate and father of a young child, wanted to be a firefighter; the District was hiring and wanted to identify qualified candidates.  Mr. Allen submitted a preliminary employment application in March 2006.  In April 2006, he signed an official letter of intent where he checked the option, "I accept participation in the entry level Firefighter Written Examination

being held on May 20, 2006." Apparently, he passed the written examination because he was then given a slot to take the PAT. *See* 6-B DCMR § 870.5 (2009).

The PAT was held at the FEMS training academy. It was designed to be rigorous, to mirror the demands of the job of a firefighter. As such, it presented a source of risk. Battalion Fire Chief Milton E. Douglas, the officer "responsible for monitoring all outside activities" at the PAT, acknowledged in his deposition that FEMS "appreciated and understood" that there was a possibility that firefighter candidates taking the PAT could get hurt. He confirmed that FEMS not only assigned "monitors" to follow candidates throughout the test to keep an eye out "for signs of distress," but also, because of "the risk . . . of injury," they had "medical staff," "EMS personnel," working at the PAT. Specifically with respect to these EMS personnel, BFC Douglas confirmed that attending to candidates if there "was an injury or some type of emergency," as well as taking candidates' vital signs before and after the PAT, was "kind of the standard thing they did"— "when injuries would take place," the EMS staff "would . . . provide assistance." This was equally true on the day Eric Allen took the PAT; the EMS personnel staffing the PAT were there "to respond to any injuries or other medical conditions that may have arisen."

According to BFC Douglas, these EMS personnel together with the monitors and "all the folks from the fire department who were participating" in staffing the PAT "undertook to . . . provide" for [the candidates taking the test] "the safest environment that was reasonably achievable:

> Q:     And so you all undertook, that is, the Fire Department, undertook to in effect provide that monitoring safety net, if you will, for the people [taking the PAT]?
> A:     Yes.
> Q:     And it was not only the monitoring but also the ability of the EMS personnel to provide assessment and treatment for the folks [taking the PAT] within the area of their expertise if it was needed."
> A:     Yes.[1]

On the day Eric Allen took the PAT, Lee Mason, a Paramedic Emergency Medical Technician (EMT), and Veronica Johnson, an EMT, were "assigned as the stand-by unit" to staff the test.  They came to the training academy with their unit containing their gear.  They set up "their first aid station" in a classroom.

---

[1] BFC Douglas agreed that the medical services provided by FEMS employees in this context were distinguishable "from . . . say a 911 call going out into the general public domain" because FEMS knows who is going to participate in the PAT and because FEMS "assume[s] the obligation to be responsible for [the candidates] when they are in that program [the PAT]."

Before the test began, FEMS staff gave all the test participants, Mr. Allen among them, "course instructions"[2] and then sent them to the first aid station to have their vital signs taken. Mr. Allen was supposed to return to the first aid station to have his vital signs rechecked after he completed the test. But when the monitor assigned to him, Captain Sylvester Robinson, met Mr. Allen at the finish line, he "was showing signs of rapid breathing that [were] not normal." He said that his "body hurt." Because he was ill, Captain Robinson "went to get Medic 33 [Ms. Mason and Ms. Johnson] to come and assist him." After Ms. Mason and Ms. Johnson retrieved additional gear from their unit, they attended to Eric Allen and, among other things, gave him oxygen and ran an electrocardiogram (EKG). A later FEMS report detailed an interview with Ms. Mason in which she was asked why she had done these things and responded, "[j]ust being a medic, that's what I do."

Unfortunately, it seems Ms. Mason did not understand how to interpret the EKG results. A subsequent FEMS internal report determined that she "exhibited negligence" and "incompetence"—and neither she nor her partner understood how ill Mr. Allen was. Ms. Johnson told FEMS investigators that at some point Mr.

---

[2] Among other things, FEMS staff instructed Mr. Allen and other PAT candidates that if "anyone . . . was waiting for them in the car that they had to leave the training grounds while the test was being administered."

Allen "asked to go to a hospital, so we called for a unit." Two Firefighter-EMTs were dispatched in their ambulance to the training academy to transport Mr. Allen. When they arrived, Mr. Allen "couldn't walk" or "talk normal" and they had to put him on a stretcher to get him into the ambulance. But Ms. Mason told them that Mr. Allen was a "Code 3 patient," i.e., "stable, non-emergency." Mr. Allen went to the hospital. He died the next day. His parents' subsequent lawsuit alleged, in part, that the EMTs provided "negligent medical care" that led to their son's death.

## II.     Analysis

### A.     This is not a public duty doctrine case—at least not as that doctrine has ever been conceived by this court.

Suggesting that this was a no-brainer from the start, the majority opinion states that "[a]t the commencement of this action, the public duty doctrine was assumed to apply." This is incorrect. To the contrary, the District did not raise the public duty doctrine until after it had twice answered the Allens' complaint and the parties had completed discovery and were gearing up for trial.[3] In other words,

---

[3] After the Allens filed their initial complaint alleging, *inter alia*, that the District FEMS employees had negligently provided medical care to their son at the PAT, the District did not move to dismiss under the public duty doctrine. Instead, the District acknowledged that the Allens had stated a claim for negligence by filing an answer. Although that answer raised defenses, the public duty doctrine

(continued…)

until well into the litigation of this case, everyone assumed that the public duty doctrine did *not* apply.[4]

This is understandable because this case looks like no prior case from the past thirty-plus years in which this court has applied this doctrine. (The majority opinion concedes that we have never considered whether the public duty doctrine applies to facts like these.) And although this court's case law on the public duty doctrine does not particularly exemplify clarity or consistency of legal reasoning,

---

(…continued)

was not one of them. After the Allens filed an amended complaint (with the trial court's permission, adding another doctor as a defendant), the District again filed an answer and said nothing about the public duty doctrine. The District additionally asserted cross-claims against the hospital and the doctors who were alleged to have provided negligent care to Mr. Allen after he left the PAT facility. It was only after the parties had completed discovery, and were gearing up for trial, that the District successfully moved to amend its answer and raised the public duty doctrine for the first time. The district then moved to dismiss, arguing that it was shielded from suit by the public duty doctrine.

The District's new argument was unrelated to the factual development of the case. In its motion and subsequently filed reply in support of its motion it cited no discovery materials related to the actions of the medical staff at the PAT test. Instead, the District's belatedly asserted, expansive argument was simply that, because the medical staff at the PAT test were emergency medical service workers, they categorically fell under the public duty doctrine.

[4] As the majority opinion notes, we ordered supplemental briefing to further assist us in analyzing the application of the public duty doctrine to these facts, but, to be clear, whether or not the District had an actionable duty of care to Mr. Allen has always been the central issue in this case, as is reflected in the pleadings in the trial court and the initial briefs to this court.

one thing is clear: We have never come close to providing a rationale for the majority's opinion.

The public duty doctrine had its genesis in this court around the early 1980s. In *Chandler v. District of Columbia*, 404 A.2d 964, 966 (D.C. 1979), a division of this court briefly considered the duty of care owed by the District government to an individual in the provision of services, but *Warren v. District of Columbia*, 444 A.2d 1 (1981) (en banc) is the case that launched the development of the public duty doctrine in the District. In *Warren*, the plaintiffs had alleged police negligence in responding to a 911 call: The police came to their front door but, seeing and hearing nothing, did nothing, thus allowing intruders already inside to abduct and repeatedly assault and rape the plaintiffs over 14 hours. In essence, the claim was a failure to rescue the plaintiffs or to prevent the harm that ensued[5] where the source of harm was totally external to the District.[6]

---

[5] Under basic principles of negligence, there is no general duty to rescue a would-be tort plaintiff from harm or prevent a third party from harming that would-be plaintiff. *See infra* Part II.B.1.

[6] Regarding injury that results from the criminal acts of third parties, it is generally accepted that "a defendant is liable for negligence only if the danger of that act should have been reasonably anticipated and protected against." *District of Columbia v. Doe*, 524 A.2d 30, 32 (D.C. 1987) (internal quotation marks omitted).

This court determined that, separate and apart from sovereign immunity,[7] the District was protected from liability at the duty stage of a tort suit, when its agents were fulfilling "public duties." 444 A.2d at 3, 9. The court explained that an actionable duty was not created by the obligation of the police to protect members of the community—the harm to the plaintiff was insufficiently foreseeable and the District's relationship to any particular individual was too general. *Id.* The court specifically rejected the argument that police officers owe a greater duty of care because of their jobs. It explained, "[a] person does not, by becoming a police officer, insulate himself from any of the basic duties which everyone owes to other people, but neither does he assume any greater obligation[8] to others individually."

---

[7] Which the District had not raised as a defense. 444 A.2d at 9.

[8] In *Warren*, the source of this potential "greater obligation" was never discussed. But according to the treatises, this is the foundation of the analysis. The point of the public duty doctrine is to respond to the argument that a statute, for example pertaining to public safety officers, creates a special duty of care. This is the general tort rule, but the public duty doctrine is employed to prohibit the recognition of special, additional statutory duties, and to keep intact the basic tort principle that there is no general duty to rescue or protect. *See* Dan B. Dobbs, *et al.*, 2 The Law of Torts § 345 (2d ed. 2011) ("In the classic case for invoking the public duty doctrine, the duty is imposed by a statute that requires the defendant to act affirmatively, and the defendant's wrongdoing is a *failure* to take positive action for the protection of the plaintiff."); *see, e.g., Madison ex rel. Bryant v. Babcock Ctr.*, 638 S.E.2d 650, 660 (S.C. 2006) (noting that the "public duty rule is applied only when an action is founded upon a statutory duty; when duty is based on common law, then its existence is analyzed as it would be with a private defendant which is not a government entity.") This court's imprecision at the outset in applying the public duty doctrine may account for the transformation of

(continued…)

*Id.* at 7-8.[9]  We determined that in certain cases where negligence by District agents was alleged, a "special duty" was required to permit the claim to go forward.  *Id.*

Judge Kelly agreed with the "public/special" duty construct but not with its application in *Warren*.  In her partial concurrence/partial dissent, she explained that, "[t]he concept of special duty is actually no more than an application of the cardinal princip[le] of tort law that, even where no duty to act may exist originally, once one undertakes to act, he has a duty to do so with due care."  444 A.2d at 11.

A few years later, in *Morgan v. District of Columbia*, 468 A.2d 1306, 1311 (D.C. 1983) (en banc), we reiterated our motivation to prevent police officials from being "placed in the position of insuring the personal safety of every member of the community."  *Id.*  At the same time, we reaffirmed that, "[a]lthough the police have no obligation to act at the behest of any one individual, once they begin to act on behalf of a particular citizen in such a way as to raise significantly the quotient

---

(…continued)
the doctrine from an inquiry into duties owed to an immunity-like shield for the District (based on the identity and function of its agents).

[9]  The en banc court "adopted . . . portions" of the trial court's opinion as its own, 444 A.2d at 3, including this explanation of the trial court's reasoning.

of risk over and above the risks assumed by every other member of the community, additional responsibilities arise." *Id.* at 1312.

By the time we turned our attention to the District's provision of emergency ambulance services this reasoning had acquired a name and the status of "doctrine." *Klahr v. District of Columbia*, 576 A.2d 718, 718 (D.C. 1990). We decided a trio of cases, *Wanzer v. District of Columbia*, 580 A.2d 127 (D.C. 1990), *Hines v. District of Columbia*, 580 A.2d 133 (D.C. 1990), and *Johnson v. District of Columbia*, 580 A.2d 140 (D.C. 1990),[10] in which a citizen previously unknown to the District called 911, but the necessary help did not come in time. We determined that because "the institution of a publicly operated emergency ambulance service is . . . incident to the police power of state: i.e., to protect the health, safety, and general welfare of its citizens," the District's ambulance services generally should be subject to the public duty doctrine. *Wanzer*, 580 A.2d at 130-31 (internal quotation marks and brackets omitted); *see also Johnson*, 580 A.2d at 141. We then rejected the arguments that the District had a duty of care that arose either from (1) FEMS "protocols and procedures" requiring them to provide emergency ambulance services in a certain manner, *Johnson*, 580 A.2d at

---

[10] These cases were decided on the same day and were "intended to be complementary and designed to be read together." *Wanzer*, 580 A.2d at 130 n.2.

141; *see also Wanzer*, 580 A.2d at 133; *Hines*, 580 A.2d at 138, or (2) an individual's specific request for services.

On the latter point, we stated, as the majority opinion quotes, that "the mere fact that an individual has emerged from the general public" by calling 911 and thus "become an object of the special attention of public employees does not create a relationship which imposes a special legal duty." *Hines*, 580 A.2d at 136; *see also Wanzer*, 580 A.2d at 132 ("A one-time call to 911 for help does not establish a special relationship. . . . It is not enough to allege ineptitude . . . by a municipal agency in failing to respond adequately to a call for help."). Invoking concerns about foreseeability and unlimited liability, we further explained that "[v]irtually every citizen of the District could find himself or herself in need of assistance from [FEMS] at one time or another." *Hines*, 580 A.2d at 138. Instead, we said that "[t]o give rise to a special relationship, the agency's response to the private party must in some demonstrable way exceed the response generally made to other members of the public." *Wanzer*, 580 A2d at 132; *see also Hines*, 580 A.2d at 139 (determining that there was no actionable duty of care because there was no "undertaking to a specific individual or a special class of persons"). Nevertheless, we recognized that the duty analysis is necessarily different when it concerns not whether and how the District was obligated to come to the rescue of a particular

individual, but instead the obligation the District owes to an individual to whom it has already undertaken to provide assistance. *See Johnson*, 580 A.2d at 142-44.[11]

In our recent decision in *Woods*, we held for the first time that even when emergency services showed up and began to provide the necessary assistance, the District could not be held liable if the EMTs were negligent in their provision of medical care. 63 A.3d 551. Once again, we acknowledged that the operative question in cases where the District has raised the public duty doctrine as a defense is whether there is an actionable duty of care. Contrary to the longstanding tort doctrine that one who undertakes to rescue or provide protection must do so with ordinary care, however, we determined that there was still no duty of care even under these circumstances. Instead, we explained that, because "District emergency personnel [were] providing the kind of on-the-scene emergency assistance that the District normally provides to the general public," liability was foreclosed under the public duty doctrine.[12] 63 A.3d at 556; *but see Hines*, 580

---

[11] Along with a failure to timely respond to a call for an ambulance, *Johnson* included a claim that the EMTs had negligently treated the decedent once they arrived. 580 A.2d at 142. The court in *Johnson* remanded this claim to the trial court for further consideration. *Id.* at 144.

[12] In her concurrence in *Woods*, Judge Oberly called for en banc review "to reexamine the scope of the public duty doctrine or perhaps even to abolish it," expressing the view that the outcome in that case "suggests that we have let the

(continued…)

A.2d at 139 (citing *Johnson* and *Weeda v. District of Columbia*, 521 A.2d 1156 (D.C. 1987)) ("D.C. could be held liable for negligent acts of [FEMS] personnel in administering emergency medical care").

Now the majority opinion applies the public duty doctrine to the Allens' lawsuit. It does so while expressing confidence not only that our current public duty doctrine precedent clearly shields the District from being sued, but also that the factual predicate for our legal analysis is beyond dispute such that this case was properly resolved on summary judgment. On both points, the majority opinion is mistaken.

This case bears no resemblance to *Wanzer*, *Hines*, *Johnson* or even *Woods*. Mr. Allen was not a citizen on the street, part of the faceless general public, who reached out to the District unexpectedly and sought the assistance of emergency services from a harm external to the District. He was one of select group of other

_____

(…continued)
doctrine sweep far more broadly than is necessary to strike the proper balance between protecting the District from sweeping liability, on the one hand, and allowing the District's citizens the chance to prove that their government has failed them miserably, on the other." *Woods*, 63 A.3d at 558. Ms. Woods filed a petition for en banc review and we stayed the Allens' appeal pending its consideration. *See* Opinion at 7. En banc review was ultimately denied.

firefighter candidates FEMS invited to its Training Facility (a location not open to the general public) to take its PAT. FEMS designed the PAT to serve its needs— i.e., to be rigorous, even dangerous, in order to simulate the real-life challenges of the job. In recognition of the risks it created, FEMS had monitors and medical staff on hand to ensure the safety of the candidates taking the PAT. The medical staff in particular were responsible for attending to anyone who got injured during the test. Ms. Mason and Ms. Johnson did their job at the PAT; they attended to and took care of Mr. Allen at the PAT when he fell ill (they just did so incompetently, according to the Allens). The District never disputed these facts in the trial court; it simply took the position that these facts had no bearing on a public duty doctrine analysis. But if all of these facts do not "in some demonstrable way" establish that the District had a particular duty to Mr. Allen, not merely a diffuse duty "to other members of the public," *Wanzer*, 580 A.2d at 132, I do not know what does.

Moreover, we cannot forget that this case comes to us from the trial court on an order granting summary judgment to the District. In this context, all the Allens had to do was to demonstrate that there was a least a triable issue of fact about the duty of care the medical staff at the PAT owed to Eric Allen. It was the District's burden to put forward uncontroverted evidence that Ms. Mason and Ms. Johnson

were fulfilling a "public duty" and thus that the public duty doctrine applied. The District never did. As noted above, its argument was that it was categorically shielded from liability because Ms. Mason and Ms. Johnson are emergency service workers. *See supra* note 3.

Because the District never grappled with the record facts, it never made the argument now advanced by the majority opinion in an effort to shoehorn this case into the *Wanzer-Hines-Johnson* line of cases. The majority opinion argues that the "record shows" the role of the medical staff at the PAT "evolved" from "monitors" to emergency service providers, and this transformation conferred on the medical staff the protection of the public duty doctrine.[13]

The majority's strained reading of the record cannot be reconciled with this court's acknowledged obligation not to ignore facts in the record and to view the facts therein in the light most favorable to the Allens. The majority's professed

---

[13] Inconsistent with its acknowledgement that Ms. Mason and Ms. Johnson provided Mr. Allen care, the majority opinion also argues that their actions are shielded by the public duty doctrine because they were "functioning in a manner similar to a 911 dispatcher who must make a call as to whether an ambulance is needed, and which type is required." But 911 dispatchers work in a communications center, have no physical contact with the people to whom they speak, and thus have no occasion to provide first aid, administer oxygen, or run EKGs.

inability to see *any* "basis for concluding that any acts or omissions by [paramedic] Mason in responding to Allen's health crisis were part of the PAT program rather than part of the District's provision of emergency services," simply disregards the deposition testimony of Battalion Fire Chief Douglas, who said that the EMTs working the first aid station were part of the PAT "safety net," and that it was their responsibility to treat test-takers in the event of injury or illness.

Meanwhile, the majority opinion can cite to no direct evidence that the medical staff were only supposed to act as "monitors," not caregivers.[14] Ms. Mason, for example, never said that she was being asked to deviate from her PAT duties when she gave Mr. Allen oxygen and ran an EKG. She said she performed those tasks because "that's what I do." Instead, the majority opinion's analysis is entirely based on weak inferences improperly drawn against the Allens.

---

[14] The majority's understanding of the medical staff's role appears to be grounded in some confusion about the staffing of the PAT. There were separate FEMS personnel who were designated "monitors"; their role was to observe the candidates as they progressed through each station of the PAT. The medical staff at the first aid station served a different function. It was their job to take the candidates' vital signs before and after the PAT and to attend to any candidates who required medical assistance during the PAT.

The majority notes that Ms. Mason and Ms. Johnson had to walk from their first aid station to Mr. Allen, and that they had to get additional gear in from the unit they drove to the training academy. From this the majority infers that taking care of Mr. Allen was not part of the medical staff's anticipated duties. That Ms. Mason and Ms. Johnson had to go to Mr. Allen to attend to him is immaterial in light of the undisputed evidence that (1) they were an integral part of the PAT safety net and (2) it was their job to take care of PAT candidates who got injured or fell ill. The more salient fact is that when Mr. Allen fell ill, Captain Robinson, the monitor for Mr. Allen, sought them out. That Ms. Mason and Ms. Johnson had to retrieve additional gear from their unit might be some indication that they believed that it was less likely that they would need it. But it is hardly conclusive proof that giving medical care to Mr. Allen, using all the gear they had in their unit (which was parked at the Training Academy[15]) was outside of the scope of their normal PAT duties. Lastly, the majority also points to a statement by Ms. Mason that she had never had to transport a candidate from the PAT to the hospital, as evidence that providing care was "not the[] usual PAT role," of medical staff. But this

_____

[15] Presumably Ms. Mason and Ms. Johnson had not driven one of the District's limited number of emergency services vehicles to the test site in lieu of using a private vehicle or taking public transportation.

testimony simply aligns with other record evidence that it was Ms. Mason and Ms. Johnson's job to be on site for the duration of the PAT.

In sum, a careful examination of the evidence developed in the trial court and uncontroverted by the District reveals that this case bears no relationship to the sorts of cases in which we have affirmed the application of the public duty doctrine—cases involving the dispatch of police, fire, or emergency services relating to a previously unknown member of the general public requiring assistance because of unforeseeable harm from a cause external to the District. Rather, the record strongly indicates, if not conclusively establishes, that FEMS had an acknowledged "special," or individual, duty to care for Eric Allen while he was at its training academy, taking its test. On this record, it was error for the trial court to rule that the District was protected by the public duty doctrine and to grant the District summary judgment.

**B.** **This court should grant rehearing en banc because the majority's public duty doctrine analysis demonstrates that the doctrine is incoherent.**

The majority's opinion demonstrates the incoherence of this court's public duty doctrine. Although we initially said that this doctrine was a function of the common law of negligence, the object of which was to discern whether the District as defendant had an actionable duty, our subsequent unbounded application indicates that we are not engaged in a duty-based inquiry. As it has developed, this court's public duty doctrine has seemingly no regard for the concept of foreseeability of harm, a foundation of the common law understanding of "duty." We find a lack of "duty" even when a government actor is engaged in face-to-face contact with a citizen of the District, and when that actor breaches what would be a duty of ordinary care in the course of that contact. If our public duty doctrine analysis has any organizing principle, it seems to turn on the identity and function of the agents of the District who are alleged to have acted negligently. But an identity-based liability shield is not a tort law concept. It is immunity.

We need to explain what we are doing and why. If discerning an actionable duty is not our aim—if instead our aim is to grant immunity—we need to say so. We also need to explain how such immunity squares with the sovereign immunity the District already enjoys and that this court has abrogated under certain

circumstances, and why we would want to revive immunity for circumstances under which we had already abrogated it. For this reason alone this court should rehear this case en banc.

*1. It seems our public duty doctrine is animated not so much by principles of negligence and a duty of care but rather by a desire to confer immunity on certain District employees.*

We have said that the public duty doctrine examines whether "an actionable duty exists" when the District is sued for negligence. *See Powell v. District of Columbia*, 602 A.2d 1123, 1127 (D.C. 1992). And we have expressed at least a superficial concern with foreseeability of harm based on the plaintiff's relationship with the defendant (here the District). *See, e.g.*, *Woods*, 63 A.3d at 559 (quoting *Warren* and *Powell*) (noting that whether a plaintiff has a special relationship with the District that gives rise to an actionable duty of care turns on whether there was "direct contact or some other form of privity between" a plaintiff and the District, such that he "becomes a reasonably foreseeable plaintiff."). In so doing, we have seemingly grounded our public duty doctrine in basic principles of negligence and

the idea that to hold an individual liable for an injury, one must first establish that individual had a duty of care.[16]

But an examination of our cases shows that this duty language does little work when the public duty doctrine is actually applied; our focus has been increasingly on the identity and function of the District employee who allegedly acted negligently. This focus was evident in *Wanzer* and *Johnson*,[17] more pronounced in *Woods*,[18] and is now dispositive in this case, where the majority determines that the role of Ms. Mason and Ms. Johnson "evolved" from mere monitor to emergency service provider, and that anyone acting in the latter role is

---

[16] Generally, in negligence actions, courts determine whether there was a duty of care by "rely[ing] on the concept of 'foreseeability'" and looking to the "relationship between the plaintiff and the defendant." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793-94 (D.C. 2011) (en banc). "If the injury that befell the plaintiff was 'reasonably foreseeable' to the defendant, then courts will usually conclude that the defendant owed the plaintiff a duty to avoid causing that injury; if the injury was not 'reasonably foreseeable,' then there was no duty." *Id.* at 793. The foreseeability of harm itself "is determined, in large part, by the nature of the relationship between the parties." *Id.* at 794. "[T]here is only a minimal duty—if any—owed to a party who is at arms' length. Once the defendant enters into a relationship with the plaintiff, however, a corresponding duty of care arises." *Id.*

[17] *Wanzer*, 580 A.2d at 130-31 (analogizing emergency medical services to police and fire services); *Johnson*, 580 A.2d at 141.

[18] 63 A.3d at 556 (concluding that liability was foreclosed because District employees were "providing the kind of on-the-scene emergency assistance that the District normally provides to the general public").

shielded by the public duty doctrine. Even if there were undisputed facts to support this evolution, *but see supra*, it is unclear why job function is dispositive if we are supposed to be thinking of this in terms of whether there was an actionable duty.

Rather, if duty of care and foreseeability of harm were the driving considerations, the majority opinion would have been unable to ignore the fact that the District created and was wholly in control of the hazardous environment in which the alleged harm to Mr. Allen occurred. FEMS structured and staffed the PAT. The District thus had "special knowledge of possible harm." *Warren*, 444 A.2d at 3. Under a true duty analysis, the District should have had an actionable duty to ensure that it provided adequate first aid services to candidates taking the PAT. *See District of Columbia v. Doe*, 524 A.2d 30, 32 (D.C. 1987) (noting that the District "has an obligation to exercise reasonable and ordinary care for the protection of pupils to whom it provides an education.")

Even setting aside the fact that this was FEMS's test and its turf, it is a canonical aspect of tort law that, although there is no general duty to rescue,

protect, or intervene in a situation to prevent or remedy harm,[19] once an individual intervenes and assists in an emergency situation, that individual has a duty to act with reasonable care.[20]  As we explained in *Warren*, the simple fact that one is a government employee, in that case a police officer, responsible for public safety, does not create a special duty of care; but an actionable duty could arise out of a more particularized connection to an individual, for example, borne of a "course of conduct [or] special knowledge of possible harm."  444 A.2d at 3.  Our focus on job function in this case and our recent decision in *Woods*, however, turn all this on its head.  It seems we are saying that a job description alone can destroy an

---

[19]  *See* Restatement (Second) of Torts § 314.

[20]  *See* Restatement (Second) of Torts § 314 cmt. a; Dobbs, *supra* note 8, § 346 (explaining that a duty exists where "the public entity is guilty of negligent action rather than inaction"). *See also Powell*, 602 A.2d at 1133 (Schwelb, J., concurring) (explaining that the public duty doctrine is "basically consistent with the common law doctrine that there is no affirmative duty to rescue absent some special relationship. In fact, the public duty cases are in some measure the analytical cousins of the private rescue cases."); *Morgan*, 468 A.2d at 1312 ("Although the police have no obligation to act at the behest of any one individual, once they begin to act on behalf of a particular citizen in such a way as to raise significantly the quotient of risk over and above the risks assumed by every other member of the community, additional responsibilities arise.") *Warren*, 444 A.2d at 11 (Kelly, J. concurring) ("One who begins to perform a service to another, whether gratuitously or not must perform with reasonable care.").

actionable duty, regardless of the actions taken by the District employee and the foreseeability of possible harm.[21] This is immunity in everything but name.

Relatedly, the majority opinion demonstrates that the definition of the "special relationship exception" has taken on a hypertechnical aspect that does not meaningfully advance the goal of identifying foreseeable plaintiffs, and thus suggests we are not fundamentally concerned with a duty of care. If the special relationship test was really being used to separate those with whom the District had engaged "directly" and who might foreseeably suffer from its negligence from anonymous members of the public who might one day seek assistance, we would not need to parse each and every interaction that an injured party had with specifically identified District agents, in order to determine that a special or individual duty was owed.

---

[21] Citing *Johnson*, the majority acknowledges the possibility that if the District personnel engaged in "affirmative action that worsens the condition of the individual receiving emergency services" it might find an actionable duty. But the observation by this court in *Johnson* that a special relationship could be based on a showing that the EMS workers who responded to the 911 caller's request for help had affirmatively worsened her condition, 580 A.2d at 142, is itself out of sync with normal duty of care principles, under which an individual who undertakes a rescue assumes a duty to act with due care. Moreover, *Johnson* was premised on *Weeda*, 521 A.2d 1156 (D.C. 1987), a negligence case in which the public duty doctrine was never raised and in which the court was examining issues of causation, not duty of care.

Even applying the test that this court has developed,[22] it is unclear why the majority is apparently of the view that the Allens' claim fails if we disregard Mr. Allen's contacts with FEMS throughout the application process to become a firefighter and focus only on Mr. Allen's contacts with FEMS at the training academy on the day of the PAT. *But see Woods*, 63 A.3d at 553 (the special relationship test examines the "direct contact or continuing contact between the victim and the governmental agency"). With foreseeability as the focus, it is unquestionably relevant that once Mr. Allen arrived at the test site and before the test began, FEMS staff met with him and the other PAT candidates, gave them "course instructions," and sent him to be examined by medical staff. It is also relevant that FEMS assigned him a monitor for the duration of the test and had first aid staff standing by, to assist him if he got injured or fell ill and to examine him

---

[22] It is only one of many troubling aspects of our public duty doctrine case law that we have not even defined "special relationship" with consistency. Even though the division opinion in *Platt v. District of Columbia*, 467 A.2d 149, 151 (1983) was issued one day before the en banc decision in *Morgan*, the two opinions contain differing formulations. The test from *Platt* requires (1) "direct or continuing contact between the victim and the governmental agency or official," and (2) "a justifiable reliance on the part of the victim," 467 A.2d at 151, while the test from *Morgan* requires (1) "a specific undertaking to protect a particular individual," and (2) justifiable reliance." 468 A.2d at 1314-15. Perhaps the formulations of the first element in both tests mean the same thing, their different language notwithstanding, *see Klahr*, 576 A.2d at 720, but if so, we have never made that clear. *See Woods*, 63 A.3d at 553 ("This court has used somewhat varying formulations to describe the circumstances in which such a special relationship will arise.").

again when the test was over. Without even considering the fact that the medical staff actually provided Mr. Allen with medical care, these are ample contacts—both direct and continuing—on which to base an actionable duty of care.

The majority opinion also states without explanation that it would not have been "practical or possible" for the District to establish contacts with Mr. Allen as one of the "nearly two dozen" or "over two dozen" test takers that day. But nothing about the fact that Mr. Allen was one of the select few the District screened and scheduled to take its PAT on that day made it less foreseeable that he might get hurt or fall ill during the PAT or converts the District's duty to care for all of the test takers into a public duty. At least in earlier cases, we have recognized that a duty of care can flow to a "class" of persons. *See Turner*, 532 A.2d 662 (explaining that a statutorily mandated special duty is owed to every adjudicated neglected child in the District); *cf. Hines*, 580 A.2d at 138 (holding that liability foreclosed because "there exists no 'class' in the sense that would justify invoking the special relationship exception to the public duty doctrine."). Our apparent movement away from that precedent again signals that we are unconcerned with identifying actionable duties in negligence cases.

Turning to the second prong of the "special relationship" test, justifiable reliance, the majority opinion faults the Allens for failing to show that their son "acted or refrained from acting in reliance on the EMTs," evoking the concept of "detrimental reliance" from the distinct realm of contract law and promissory estoppel. *See also Woods*, 63 A.3d at 557 (using the term "detrimental reliance"). It is hard to understand why this type of reliance is required to establish foreseeability and a duty of actionable care. *See Morgan*, 468 A.2d at 1315 (explaining that the purpose of what we called the element of "particular reliance" was "to place law enforcement officials on notice as to the foreseeable consequences of failure to exercise reasonable care, not unlike the knowledge that a citizen employed in law enforcement efforts must be protected from harm."). And it is even harder to understand how the trial court could have concluded that there was no genuine dispute of material fact as to Mr. Allen's reliance, even under this standard.

It seems amply reasonable to infer from the record facts that when Ms. Mason and Ms. Johnson provided medical assistance to Mr. Allen, he relied on them to care for him and to do so professionally. He could not walk; he could not speak "normal[ly]." He was in grave need of medical assistance and unable to seek out alternative means of care. And since FEMS had sent all non-test-taking

civilians away, he had no one else to help him except FEMS staff. To quote Judge Oberly in *Woods*, "Heaven help us," if such an individual, "after being examined, has no right to rely on the attending EMTs to accurately diagnose his or her medical condition or rely on their recommendation as to whether or not further medical assistance is needed."[23] 63 A.3d at 560.

Putting all of this together, there is much in our public duty case law and in the majority's decision that both is inconsistent with a duty-based analysis and suggests that we are determining that liability does not apply to certain categories of District employees, i.e., they are immune from suit. If we are applying the public duty doctrine as a form of immunity, we should say so. We should also be ready to justify why we think we can recreate sovereign immunity in this manner and why we think it is a good idea to do so.

---

[23] The majority notes that Mr. Allen signed a liability waiver, an unsurprising fact since he wanted to be able to take the test and move forward with his job application. This waiver might defeat liability at a later point in the case if the District could show it was binding, but it fails to conclusively demonstrate that Mr. Allen did not justifiably rely on the medical staff at the PAT to care for him when he fell ill.

*2. If the public duty doctrine is actually a form of court-created immunity, we have not explained how it aligns with our sovereign immunity jurisprudence.*

Although the District government enjoys the protection of sovereign immunity, we have long recognized, following the federal government[24] and most states, that this immunity is not and should not be absolute—that there are certain instances where it is appropriate to hold the government to account in a court of law. Before this court came into being, the United States District Court for the District of Columbia Circuit determined that the sovereign immunity did not protect the District when its employees were performing "proprietary," as opposed to "governmental," acts. *See Calomeris v. District of Columbia*, 226 F.2d 266 (D.C. Cir. 1955). In other words, when the District was acting as a government, it could not be held liable, but when it was acting as employer, business owner, or in other non-policy-making capacities, sovereign immunity was not a bar to liability. This distinction, once popular in many state and federal courts, was much criticized—when a government was "acting as a government" was not easily or

---

[24] Congress partially abrogated the sovereign immunity of the federal government with the passage of the Federal Tort Claims Act (FTCA) in 1948. It did not include the District of Columbia in this waiver, however. *See* 28 U.S.C. § 2671 (2012); *see also Spencer*, 425 F.2d at 481; *Wade*, 310 A.2d at 861 (acknowledging that the District is "influenced by the provisions of the [FTCA]," but not technically subject to it).

consistently discerned. *See Spencer v. General Hosp. of District of Columbia*, 425 F.2d 479, 484 (D.C. Cir. 1969). The federal appellate court discarded the governmental-proprietary distinction in *Spencer*, and in its stead endorsed the distinction drawn in the Federal Tort Claims Act between "discretionary" acts, i.e., policy decisions, and "ministerial" acts that involve execution without discretion.[25] *Id.* After Congress created this court, we reaffirmed that the District's sovereign immunity survives for "discretionary" acts but not "ministerial" acts of the government; in the latter instance we said that "the District must respond" to suit. *See Wade v. District of Columbia*, 310 A.2d 857, 860 (D.C. 1973) (en banc).

We have stated that the public duty doctrine operates separate and apart from a sovereign immunity analysis. Whether the District government is shielded from suit by sovereign immunity is the first consideration; if it is not, the second consideration is whether there is an actionable duty. *See Chandler*, 404 A.2d 964, 966 (D.C. 1979) ("[T]he questions of immunity and duty owed require separate analysis . . . . Immunity revolves around the necessity or desirability of freeing

---

[25] The FTCA waives the federal government's sovereign immunity for negligent "act[s] or omission[s] . . . under circumstances where the United States, *if a private person*, would be liable to the claimant in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346 (b)(1) (2012) (emphasis added); *see also id.* § 2674, provided that the act complained of is not "a discretionary function or duty," *id.* § 2680 (a).

policy decisions from jury speculation; a duty of care, on the other hand, concerns foreseeability."); *see also Powell*, 602 A.2d at 1126 (acknowledging that the public duty doctrine "limit[s] the District's liability in negligence cases where sovereign immunity is not a bar to suit.").[26]

But if the public duty doctrine is, in effect, another form of immunity, at least two problems arise. First, if the alleged conduct was a ministerial act for which the District can be sued under a sovereign immunity analysis, it is then a contradiction to say that, based on the same conduct, the District in fact enjoys immunity under the public duty doctrine and cannot be sued.[27] This is not to say

---

[26] We have not always been clear about holding this line either, and at times we have invoked the public duty doctrine alongside or even instead of sovereign immunity for discretionary acts. *See, e.g.*, *Nealon v. District of Columbia*, 669 A.2d 685, 693 (D.C. 1995) (explaining that discretionary decisions about water pressure in fire hydrants are protected by *both* the public duty doctrine and sovereign immunity); *Allison Gas Turbine Div. of Gen. Motors Corp. v. District of Columbia*, 642 A.2d 841, 845 (D.C. 1994) (applying the public duty doctrine to District officers carrying out a river rescue "that necessarily required the exercise of discretion"); *Morgan*, 468 A.2d at 1311 (explaining the public duty doctrine is necessary to "protect[] the exercise of law enforcement discretion").

[27] For this reason, a number of states have discarded the public duty doctrine or declined to adopt it. *See, e.g.*, *Adams v. State*, 555 P.2d 235, 241-42 (Alaska 1976); *Leake v. Cain*, 720 P.2d 152, 160 (Colo. 1986) (en banc); *Doucette v. Town of Bristol*, 635 A.2d 1387 (N.H. 1993); *Schear v. Bd. of Cnty. Comm'rs of Bernalillo Cnty.*, 687 P.2d 728 (N.M. 1984); *Coffey v. City of Milwaukee*, 247 N.W.2d 132 (Wis. 1976). As Alaska Supreme Court explained in *Adams*:

(continued…)

that this court lacks the power to create an additional "public duty" immunity. Unlike the federal government[28] and most states where sovereign immunity is statutorily abrogated, our sovereign immunity jurisprudence as well as our public duty doctrine is defined by common law. Since it is judge-made, we can change it. *See Spencer*, 425 F.2d at 479 (explaining that this is why the courts had the power to discard the governmental-proprietary test of sovereign immunity). It is beyond the scope of this dissent to review why absolute immunity for government actors has been universally rejected and why the general consensus coalesced around the discretionary/ministerial divide for actionable claims.[29] But at the very least, it is

---

(…continued)

> An application of the public duty doctrine here would result in finding no duty owed the plaintiffs or their decedents by the state, because, although they were foreseeable victims and a private defendant would have owed such a duty, no 'special relationship' between the parties existed. Why should the establishment of duty become more difficult when the state is the defendant? Where there is no immunity, the state is to be treated like a private litigant.

555 P.2d at 241-42.

[28] The federal government does not have a public duty doctrine, and has in fact disavowed such an approach to assessing its liability under the Federal Tort Claims Act (FTCA). *See United States v. Olson*, 546 U.S. 43, 45-46 (2005) (explaining that, although a cause of action for negligence may arise out of state law, FTCA precludes assessment of the federal government's liability according to state-level standards applicable to state or municipal government entities); *see also Lumsden v. United States*, 555 F.Supp.2d 580, 595 (E.D.N.C. 2008) ("The 'public duty' doctrine has no application to an FTCA action").

[29] I note, however, that the majority opinion revives a hoary counterargument in favor of broad governmental immunity—namely, that if we

(continued…)

irresponsible for us to redraw immunity lines without considering why our law developed in the direction it did.

This leads to the second problem: the manner in which we seem to be redrawing immunity lines. As noted above, we seem to be elevating function over action. When an emergency services worker is acting in her capacity as an emergency services worker, no matter what she actually does, the District is not liable for her actions. If an emergency services worker enjoys this immunity, why not an emergency room doctor, or for that matter a school nurse, or a teacher? This sounds a lot like immunity for "governmental" functions—i.e., the construction of sovereign immunity that was rejected in *Spencer*, 425 F.2d at 483 and again in *Wade*, 310 A.2d at 860.[30] We said in *Spencer* that "a plaintiff is not

_____

(…continued)
hold the government accountable for its negligent provision of services, we will create a "perverse incentive" for the government to decline to provide those services. But the reality is that the District continues to offer a number of services in areas to which we do not extend the public duty doctrine: for example, public schools, *see Doe*, 524 A.2d at 32 (D.C. 1987) (affirming a judgment against the District for failure to provide adequate security at an elementary school), public swimming pools, *see District of Columbia v. Zukerberg*, 880 A.2d 276, 282 (D.C. 2005) (upholding a jury verdict holding the District liable for negligent provision of lifeguard services) and public health clinics, *see District of Columbia v. Perez*, 694 A.2d 882, 886 (D.C. 1997) (affirming a jury verdict against the District for committing medical negligence).

[30] This was part of the Wisconsin Supreme Court's reasoning when it declined to adopt the public duty doctrine over three decades ago. *Coffey*, 247

(continued…)

automatically out of court whenever it appears that the injury grew out of the operation by the District of a school, or a hospital, or in the course of any other activity carried on by the District because it is a government." 425 F.2d at 487. But if the public duty doctrine is functioning to re-immunize the District for ministerial actions for which sovereign immunity is abrogated, we appear to have overruled prior precedent *sub silentio*.

### C. This court should grant rehearing en banc because there are compelling reasons to discard the public duty doctrine.

The previous section explains the need for this court to rehear this case en banc if only to attempt to make some sense of the public duty doctrine. I am skeptical that we would succeed, however, and I question how hard we should try. The fact is that the states that have a public duty doctrine employ it in a manner that bears little relationship to ours; the name is the same and little else. Moreover, many states around the country have discarded the public duty doctrine they had or have declined to adopt some sort of public duty doctrine in the first place. Using

---

(…continued)
N.W.2d at 139 ("The 'public duty'-'special duty' distinction espoused in the cases cited by the [government] set up just the type of artificial distinction between 'proprietary' and 'governmental' functions which this court sought to dispose of.").

these states as a point of reference, we should consider whether we need a public duty doctrine that protects the District from suit over and above the protection it already enjoys from other sources and whether this extra protection is in District residents' best interests. To address these questions and ultimately the question of whether we should discard the public duty doctrine, I call upon the court to rehear this case en banc.

There are other states that have something called a public duty doctrine, but it is distinct from the District's doctrine of the same name. Elsewhere there is an appreciation of the tort law origins of the doctrine, specifically that it arose out of a desire to reject assertions of "special duties" for government agents derived from statutes. *See supra* note 8. In a number of states, the "public duty doctrine" only precludes claims that the police failed to protect a citizen from harm caused by a third party.[31] Even the states that have a broader conception of the public duty

---

[31] *See, e.g.*, *Stevenson v. City of Doraville*, 726 S.E.2d 726, 728 (Ga. 2012) ("The public duty doctrine applies only to the provision of police protection services, such as requests for emergency help." (internal quotation marks omitted)); *Benton v. City of Oakland City*, 721 N.E.2d 224, 230 (Ind. 1999) (considering the public duty doctrine to be a form of immunity that relieves government actors of the obligation to "prevent crime"); *Beaudrie v. Henderson*, 631 N.W.2d 308, 313 (Mich. 2001) (declining to expand the public duty doctrine beyond those cases "alleging a failure to provide police protection from the criminal acts of a third party."); *Wood v. Guilford Cnty.*, 558 S.E.2d 490, 495 (N.C. 2002) (explaining that the public duty doctrine applies only to "the provision of

(continued…)

doctrine recognize that, once a government actor "affirmatively act[s] to protect or assist the specific individual," the public duty doctrine does not apply.[32]

Furthermore, there has been a movement by states away from any sort of public duty doctrine. Some that formerly employed the doctrine have abandoned it.[33] Others have considered, but declined to adopt, "the confusing and inconsistent public duty doctrine."[34] These states' reasons for rejecting the public duty doctrine are varied but include: a concern that it conflicts with waivers of sovereign

---

(…continued)
police protection"); *Commonwealth v. Burns*, 639 S.E.2d 276, 278 (Va. 2007) ("This Court has only applied the public duty doctrine in cases when a public official owed a duty to control the behavior of a third party, and the third party committed acts of assaultive criminal behavior upon another.").

[32] *Muthukumarana v. Montgomery Cnty.*, 805 A.2d 372, 401 (Md. 2002); *see Chambers-Castanes v. King Cnty.*, 669 P.2d 451, 458 (Wash. 1983) (en banc) (acknowledging this court's decision in *Warren* and opining that a special duty should have been recognized in that case).

[33] *See, e.g.*, *Ryan v. State*, 656 P.2d 597 (Ariz. 1982) (en banc); *Leake*, 720 P.2d 152; *Commercial Carrier Corp. v. Indian River Cnty.*, 371 So.2d 1010 (Fla. 1979); *Jean W. v. Commonwealth*, 610 N.E.2d 305 (Mass. 1993); *Doucette*, 635 A.2d 1387; *Schear*, 687 P.2d 728; *Wallace v. Ohio Dep't of Commerce*, 773 N.E.2d 1018 (Ohio 2002); *Brennen v. City of Eugene*, 591 P.2d 719 (Ore. 1979) (en banc); *Natrona Cnty. v. Blake*, 81 P.3d 948 (Wyo. 2003).

[34] *Hudson v. Town of E. Montpelier*, 638 A.2d 561, 568 (Vt. 1993); *see also, e.g.*, *Adams*, 555 P.2d 235; *Cormier v. T.H.E. Ins. Co.*, 745 So.2d 1 (La. 1999); *Maple v. City of Omaha*, 384 N.W.2d 254 (Neb. 1986); *Ficek v. Morken*, 685 N.W.2d 98 (N.D. 2004); *Coffey*, 247 N.W.2d 132.

immunity,[35] the determination that the application of traditional negligence principles will sufficiently regulate liability,[36] and "perhaps the most persuasive reason, . . . it creates needless confusion in the law and results in uneven and inequitable results in practice."[37]

---

[35] *See supra* note 27.

[36] *See, e.g.*, *Leake*, 720 P.2d at 160 ("The fear of excessive governmental liability is largely baseless in view of the fact that a plaintiff seeking damages for tortious conduct against a public entity must establish the existence of a duty using conventional tort principles, such as foreseeability, in the same manner as if the defendant were a private entity."); *Doucette*, 635 A.2d at 1391 ("We expect that proof of negligence will continue to be a sufficient test of claims against cities and towns to separate worthy suits from those without merit."); *Schear*, 687 P.2d at 733-34 (noting that abolition of the doctrine will not result in the government's "[s]trict liability for failure to adequately perform a duty," rather "[l]iability will not attach until all of the elements of negligence have been proved, including duty, breach of duty, and proximate cause."); *Wallace*, 773 N.E.2d at 1031 ("[C]onventional negligence principles already provide some measure of protection against the possibility of the state's becoming the de facto guarantor of every injury somehow attributable to the actions of a state tortfeasor.").

[37] *Leake*, 720 P.2d at 159; *see also, e.g.*, *Ryan*, 656 P.2d at 599 ("We shall no longer engage in the speculative exercise of determining whether the tort-feasor has a general duty to the injured party, which spells no recovery, or if he had a specific individual duty which means recovery."); *Jean W.*, 610 N.E. at 307 ("We have concluded that our prior efforts to distinguish viable claims from those subject to dismissal by use of the public duty-special relationship dichotomy have not succeeded in producing a rule of predictable application."); *Doucette*, 635 A.2d at 1390 ("Courts . . . have found that the public duty rule and its exceptions cause legal confusion, tortured analyses, and inequitable results in practice.").

This court should be reassured by the fact that these jurisdictions have not descended into anarchy or bankruptcy as the defenders of the public duty doctrine warned,[38] and we should be guided by these states' reasoning. There is no need to say any more about "confusion in the law." And we too have other mechanisms to prevent the government from facing unlimited liability. The District is protected not only by sovereign immunity, but also by the traditional elements of a negligence claim—i.e., that in addition to establishing an actionable duty a plaintiff must also prove breach and causation—as Judge Kelly reminded her colleagues in *Warren*.[39] Had we relied on these protective mechanisms in a number of our public duty doctrine cases, we might have reached the same result, i.e., no liability for the District, but in a more coherent and just way.

On the other hand, this court should consider the benefits of allowing the District to be subject to liability. With a public duty doctrine that functions as

---

[38] *See Ryan*, 656 P.2d at 598 ("We are also told that not only will the public treasury suffer but government will come to a standstill because its agents will be afraid to act. We can't but recall the dire predictions attendant to the publication of [the court's decision to abrogate sovereign immunity]. Arizona survived!").

[39] 444 A.2d at 12 (responding to concerns about opening the "floodgates of litigation," she observed that "[t]he argument is . . . made as if there were no such legal principles as fault, proximate cause or foreseeability, all of which operate to keep liability within reasonable bounds").

immunity, one can easily see how difficult problems might not be given priority. Relieved of any concern about responding to discovery, having an agency's dysfunction aired in a court of law, or the possibility of having to pay out a substantial damages award or to operate under court-supervision, the District's incentive to address poor delivery of services or mismanagement is much reduced. *Cf. Schear*, 687 P.2d at 733-34 ("any [public funds] associated with programs aimed at reducing law enforcement officers' negligence, or awarded to victims of negligent performance of duty, will be far outweighed by the advantage to society of more responsive agencies.").

This court has for decades shielded FEMS and other District agencies from the healthy scrutiny that comes with the possibility of being sued. And to what end? FEMS has been repeatedly in the news, and the press has not been favorable. In the aggregate, these news reports indicate serious dysfunction. I detail these reports not because I accept every fact reported as true, but because, where there is this much smoke, it seems incumbent upon us to consider whether something might be burning and whether we are feeding the flames.

Eight years ago, the District's emergency medical services made national news when a *New York Times* journalist, David Rosenbaum, died after receiving

sub-standard emergency medical care from FEMS EMTs.[40]  According to news reports, "[a] string of mistakes and inadequate training led to a collective and erroneous conclusion that Mr. Rosenbaum was drunk when in fact he had been beaten with a metal pipe and robbed."[41]  A District of Columbia Office of Inspector General (OIG) report found that District employees did not arrive on the scene expeditiously after the emergency dispatch, did not perform a proper assessment of Mr. Rosenbaum, and did not transport Mr. Rosenbaum to the closest hospital, among other failures.[42]  Then-Inspector General Charles J. Willoughby called the FEMS response to Mr. Rosenbaum "an unacceptable chain of failure in the provision of emergency medical and other services" that suggests an "alarming level[] of complacency and indifference."[43]  *Id.*

---

[40]  *See, e.g.*, Robert Davis, *D.C. Emergency Chief Apologizes in Reporter's Death*, USA TODAY, June 19, 2006, http://usatoday30.usatoday.com/news/nation/2006-06-19-dc-rosenbaum_x.htm; David Stout, *Inquiry Into Reporter's Death Finds Multiple Failures in Care*, N.Y. TIMES, June 17, 2006, http://www.nytimes.com/2006/06/17/washington/17district.html.

[41]  Stout, *supra* note 40.

[42]  *See* GOVERNMENT OF THE DISTRICT OF COLUMBIA, OFFICE OF THE INSPECTOR GENERAL, SUMMARY OF SPECIAL REPORT:  EMERGENCY RESPONSE TO THE ASSAULT ON DAVID E. ROSENBAUM (2006), *available at* http://www.washingtonpost.com/wp-srv/metro/pdf/Rosenbaum.pdf.

[43]  Then-FEMS Chief Adrian Thompson called this incident an "aberration." John Pekkanen, *What Happens When You Call 911 in Washington, DC*, WASHINGTONIAN, Feb. 1, 2009,

(continued…)

This was the District's opportunity to demonstrate that, the public duty doctrine notwithstanding, "[p]ublic officials at all levels remain accountable to the public. . . through internal disciplinary proceedings," and other political or administrative means, a justification that the majority opinion, echoing prior decisions of this court, has proffered for our public duty doctrine. *Warren*, 444 A.2d at 8; *see also* Opinion at 12 n.11 (quoting *Morgan*, 468 A.2d at 1312, for the proposition that "other effective mechanisms exist to control the behavior of errant . . . officials."). There was an official response. Members of Mr. Rosenbaum's family joined several experts and stakeholders to form a Task Force, which produced a report in 2007 offering recommendations for improving the District's emergency medical services.[44] The D.C. Council passed some legislation.[45] And then more people died.

---

(…continued)
http://www.washingtonian.com/articles/people/what-happens-when-you-call-911-in-washington-dc/index.php. "But for many with inside knowledge of DC's emergency medical service, the only aberration in Rosenbaum's needless death was that the District's inadequate emergency care had come to light." *Id.*

[44] TASK FORCE ON EMERGENCY MEDICAL SERVICES, REPORT AND RECOMMENDATIONS, Sept. 27, 2007, *available at* http://fems.dc.gov/sites/default/files/dc/sites/fems/publication/attachments/final_report_with_appendices_9_26.pdf.

[45] *See* Emergency Medical Services Improvement Act of 2008, D.C. Law No. 17-313, 55 D.C. Reg. 2258 (2008) (codified as amended at D.C. Code § 5-401 et. seq. (2012)). The legislation renamed the Fire Department FEMS and created the mayorally-appointed post of Medical Director who is second to the Fire Chief
(continued…)

In April 2008, Jeremy Miller, a 35-year-old District resident, died after FEMS responders reportedly went to the wrong address after a 911 dispatch and took 34 minutes to reach him.[46] In December 2008, Edward Givens, a 39-year-old District resident and father of two, died of a heart attack two hours after he was reportedly told by EMTs to take Pepto Bismol when he reported chest pain and trouble breathing.[47] In December 2009, Phyllis Woods died of a stroke after she was reportedly told by EMTs that she was just experiencing withdrawal symptoms as a result of her decision to quit smoking.[48] On December 31, 2012, when over 100 FEMS personnel had called in sick,[49] Durand Ford, Sr. died after allegedly waiting thirty to forty minutes before an ambulance finally arrived from Prince

---

(…continued)

and bears the responsibility to "[p]rovide medical oversight for all aspects of pre-hospital medical services provided by the Department," and to "[s]upervise the administration of pre-hospital medical care. *Id.*

[46] Pekkanen, *supra* note 43.

[47] Pekkanen, *supra* note 43; *see also* Elissa Silverman, *D.C. Paramedic Might Not Have Followed Procedures in Response to Edward Givens*, WASH. POST, Mar. 25, 2009, http://www.washingtonpost.com/wp-dyn/content/article/2009/03/24/AR2009032402871.html.

[48] *Woods*, 63 A.3d at 552.

[49] Martin Austermuhle, *More Than 100 D.C. Firefighters Called in Sick on New Year's Eve*, DCIST (Jan. 3, 2013, 4:00 PM), http://dcist.com/2013/01/firefightersnye.php.

George's County, Maryland.[50] Although (thankfully) not a fatality, in March 2013, "[a] D.C. police officer seriously injured in a hit-and-run . . . had to wait at least 15 minutes for an ambulance from another jurisdiction because there were none available in the District."[51] A report later found that "three D.C. fire department ambulances were improperly out of service" at the time.[52]

---

[50] Clarence Williams, *D.C. Sued Over Death of Man Who Waited 30 Minutes for Ambulance*, WASH. POST, July 3, 2013, http://www.washingtonpost.com/local/dc-sued-over-death-of-man-who-waited-30-minutes-for-ambulance/2013/07/03/33356512-e425-11e2-80eb-3145e2994a55_story.html.

[51] Peter Hermann, Debate Over D.C. Fire Staffing Renewed After Officer's Long Wait for Ambulance, WASH. POST, Mar. 6, 2013, http://www.washingtonpost.com/local/debate-over-dc-fire-staffing-renewed-after-officers-long-wait-for-ambulance/2013/03/06/ba878656-8685-11e2-98a3-b3db6b9ac586_story.html.

[52] Peter Hermann, *Three D.C. Ambulances Improperly Out of Service When Injured Officer Needed Help*, WASH. POST, Mar. 19, 2013, http://www.washingtonpost.com/local/three-dc-ambulances-improperly-out-of-service-when-injured-officer-needed-help/2013/03/19/2c99e79a-90d9-11e2-9abd-e4c5c9dc5e90_story.html. Issues with the FEMS fleet are a separate subject of scandal. There have been reports of ambulances being repaired with street signs, *see* Andrea Noble, *D.C. Fire Chief in Charge of Fleet Maintenance Demoted*, WASH. TIMES, Sept. 4, 2013, http://www.washingtontimes.com/news/2013/sep/4/dc-fire-chief-in-charge-of-fleet-maintenance-demot/; ambulances catching on fire, *see* Peter Hermann, *Two D.C. Ambulances Catch Fire While on Call,* WASH. POST, Aug. 13, 2013, http://www.washingtonpost.com/local/two-dc-ambulances-catch-fire-while-on-call/2013/08/13/40e5f68c-0427-11e3-88d6-d5795fab4637_story.html; and on one occasion, an ambulance assigned to the President's motorcade running out of gas because of an undetected broken gas gauge, *see* David Jackson, *Obama Motorcade Ambulance Runs Out of Gas*, USA TODAY, Aug. 13, 2013,

(continued…)

The most prominent report of FEMS incompetence at the time of this writing relates to Medric "Cecil" Mills, a 77-year-old District resident who died in January 2014, after he collapsed from a heart attack just across the street from a fire station filled with FEMS emergency workers who reportedly stood by and did nothing to assist him.[53] According to news reports, bystanders and Mr. Mills's daughter pled for help; members of the public "yelled" out to firefighters and banged on the door of the fire station. When Mr. Mills's daughter saw one of the five firefighters at the station standing in a doorway, she called out: "'Can you just come and help my dad?' she screamed. 'What are you going to do, let my dad die in the street?'"[54] Still, according to news reports, they did nothing. A bystander called 911, but the emergency dispatcher had mistakenly sent a unit to 1309 Rhode Island Avenue Northwest instead of the corresponding address in Northeast—a location nearly three miles away.[55] Mr. Mills received the attention of the

---

(…continued)
http://www.usatoday.com/story/theoval/2013/08/13/obama-white-house-motorcade-ambulance-out-of-gas/2647831/.

[53] Peter Hermann, *Man, 77, Dies After Collapsing Near D.C. Fire Station and Not Getting Immediate Aid*, WASH. POST, Jan. 29, 2014, http://www.washingtonpost.com/local/crime/man-77-dies-after-collapsing-near-dc-fire-station-and-not-getting-immediate-aid/2014/01/29/13b44662-88fe-11e3-a5bd-844629433ba3_story.html.

[54] *Id.*

District's emergency services only when a police officer managed to flag down a passing ambulance.[56]

Again, there has been an official response to this sad incident. Paul A. Quander, Jr., Deputy Mayor for Public Safety and Justice, wrote a report.[57] But it was reported that, as of June 2014, FEMS had not even implemented all of the recommendations from the 2007 post-Rosenbaum task force report.[58] Meanwhile, disciplinary proceedings—the exact sort of remedy so praised by the majority opinion—were closed to the public as well as Mr. Mills's family. In July 2014, it was reported that none of the firefighters involved would be fired, one would be given a reprimand, and another would be given a sixty-hour suspension, but the

---

(…continued)

[55] Peter Hermann, *Report on Death of Man Outside D.C. Fire Station: Five Firefighters Should Be Disciplined*, WASH. POST, Feb. 21, 2014, http://www.washingtonpost.com/local/crime/report-on-death-of-man-outside-fire-station-says-five-firefighters-should-be-disciplined/2014/02/21/f35f111a-9a2a-11e3-b88d-f36c07223d88_story.html.

[56] *Id.*

[57] PAUL A. QUANDER, JR., REPORT (2014), *available at* http://dmpsj.dc.gov/sites/default/files/dc/sites/fems/publication/attachments/Final%20Rhode%20Island%20Report.pdf.

[58] Peter Hermann, *D.C. Fire Chief Ellerbe to Step Down in July, Ending Tenure Marred by Service Complaints*, WASH. POST, June 4, 2013, http://www.washingtonpost.com/local/crime/2014/06/0483c2dc02-eb55-11e3-93d2-edd4be1f5d9e_story.html.

text of the disciplinary rulings is not publicly available.[59]  The lieutenant in charge

the day of the Mills incident was granted retirement before facing disciplinary

charges.[60]

This court could dismiss as coincidence the fact that we shield FEMS from

being held liable for its negligence under our public duty doctrine and the string of

FEMS's reported failures to provide adequate emergency services to District

residents.  But I would urge this court to consider whether there is a causal

connection and whether our public duty doctrine might be bad for the health of the

District government and its citizens.  If nothing else, this should prompt us to

reconsider our public duty doctrine.

*  *  *

---

[59]  Peter Hermann, *Two D.C. Firefighters in Mills Case Disciplined; None Fired, One Exonerated*, WASH. POST, Aug. 22, 2014, http://www.washingtonpost.com/local/crime/two-firefighters-in-mills-case-disciplined-none-fired-one-exonerated/2014/08/21/abd20a90-2941-11e4-958c-268a320a60ce_story.html.

[60]  Peter Hermann, *D.C. Fire Lieutenant Accused of Neglect of Duty Retires Before Panel Decides Her Fate*, WASH. POST, Apr. 10, 2014, http://www.washingtonpost.com/local/crime/dc-fire-lieutenant-accused-of-neglect-of-duty-retires-before-panel-decides-her-fate/2014/04/10/665d4702-c0de-11e3-b574-f8748871856a_story.html.

The parents of Eric Allen just want their day in court to try to hold the District accountable for the tragedy that befell their son.  We are wrong not to give it to them.  But beyond the Allens, we are wrong in any case to continue applying and expanding our incoherent and ultimately unjust public duty doctrine.  I am not the first judge on this court to call for its reconsideration and rejection.  But I hope I will be the last.  The public duty doctrine we launched over thirty years ago has become an analytic mess that may, in fact, foster the delivery of substandard emergency services.   It is time for its creators to put it to rest.